**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-1890 and 11-2584
_____

UNITED STATES OF AMERICA

v.

FREDERICK UGWU; AMER MIR

Frederick Ugwu
        Appellant in No. 11-1890

Amer Mir
        Appellant in No. 11-2584
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Nos. 2-08-cr-00561-004 & 2-08-cr-00561-003 )
District Judge: Honorable Jose L. Linares
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 7, 2013

Before:   RENDELL, AMBRO, and VANASKIE, *Circuit Judges*

(Filed: September 4, 2013)
_____

OPINION
_____

VANASKIE, *Circuit Judge.*

Frederick Ugwu and Amer Mir appeal their convictions following a jury trial on conspiracy, wire fraud, and money laundering charges arising out of a scheme to defraud mortgage lenders. Although only Ugwu argued at trial that the evidence did not warrant a willful blindness instruction, both Defendants now assert that the District Court erred in giving such an instruction. Both Defendants also contend that the District Court erred in refusing to give a curative instruction after the Government commented on Defendants' failure to present the testimony of the alleged ring-leader of the conspiracy. Finally, Mir challenges the District Court's decision to add two points to his offense level for abuse of a position of trust, as well as its calculation of the financial loss attributable to him for purposes of sentencing and restitution. Finding no error in any of the challenged rulings, we will affirm the District Court's judgment.

## I.

We write primarily for the parties, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those facts necessary to our analysis.

Ugwu and Mir were charged in a ten-count Superseding Indictment with conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, and money laundering. Also charged were, among others, Michael Eliasof, a real estate agent, and Jerry Carti, a loan officer and part owner of U.S. Mortgage.[1] The charges arose out of a scheme to sell two and three-family homes in the Paterson, New Jersey area at grossly inflated prices to unqualified buyers.

---

[1] Both Eliasof and Carti pled guilty.

Specifically, Ugwu, an experienced real estate investor, purchased properties in poor condition for an average purchase price of $85,000. He made minimal, if any, repairs to the homes to make them "appear habitable to appraisers and prospective tenants." (App. 36). Eliasof introduced potential buyers to Mir, a loan officer at United Home Mortgage. The prospective purchasers were told that Eliasof would manage the properties and that the mortgage payments would be covered by rental payments. Mir and Carti falsified loan applications so that unqualified buyers were approved. Once the unqualified buyers were approved, closings would take place at the law office of William Colacino, an attorney and municipal judge. At closing, the conspirators prepared false RESPA settlement statements that misrepresented moneys due from the buyers and payable to the sellers. The buyers signed these documents without reviewing them and left without keys to the properties.

Ugwu appeared at the closings with his attorney, generally after the buyers had left. Ugwu's attorney typically reviewed the documents containing false information regarding buyer payments. Ugwu falsely assured his attorney that he had already received fictitious deposits reflected on the closing documents prior to signing. The conspirators split the proceeds of the fraudulently obtained mortgage loans.

Throughout the life of the scheme, Ugwu received almost $4 million for his role, and was responsible for losses totaling more than $1.6 million. Mir received at least $210,000, and was responsible for more than $2.3 million in losses.

II.

3

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291.

A.

Ugwu contends that the District Court erred in instructing the jury on willful blindness, not because the actual instruction was incorrectly stated, but because such an instruction was not warranted in light of the evidence from which the jury could have inferred his actual knowledge of the fraud. He argues that the jury should have been instructed only on the government's burden to prove his actual knowledge of the fraudulent scheme.

We have specifically rejected the contention that "so long as there is sufficient evidence of actual knowledge, a willful blindness charge is at all events inappropriate." *United States v. Wert-Ruiz*, 228 F.3d 250, 252 (3d Cir. 2000). As we explained in *Wertz-Ruiz*:

> Assuming there to be sufficient evidence as to both theories, it is not inconsistent for a court to give a charge on both willful blindness and actual knowledge. This is so because, if the jury does not find the existence of actual knowledge, it might still find that the facts support a finding of willful blindness.

*Id.* (citing *United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999)). Therefore, contrary to Ugwu's contention, the District Court did not err by instructing the jury on both knowledge and willful blindness if there was sufficient evidence to support both theories.

4

Ugwu contends that there was insufficient evidence to support a willful blindness instruction. We review a challenge to the District Court's determination that the evidence supports the giving of a willful blindness instruction for abuse of discretion. *United States v. Stadtmauer*, 620 F.3d 238, 252 (3d Cir. 2010). In evaluating the sufficiency of the evidence to sustain the charge, we "view the evidence and the inferences drawn therefrom in the light most favorable to the [G]overnment." *Wertz-Ruiz,* 228 F.3d at 255.

There was sufficient factual evidence presented at trial to support the District Court's decision to give a willful blindness instruction. Ugwu, an intelligent and experienced businessman, had participated in approximately 300 closings. Ugwu was represented by an attorney, and signed letters stating that he had reviewed the HUD-1 documents. When Eliasof was involved, instead of receiving the total deposit amount listed on the HUD-1, Ugwu received a larger sum and turned large portions of the settlement amount over to Eliasof. Ugwu also signed letters documenting large payments to Eliasof for home repairs, while it was Ugwu himself repairing the properties. Presented with these facts, a reasonable jury could have found that Ugwu, who did not admit knowledge of the fraudulent nature of the transactions, was aware that the transactions with Eliasof were likely fraudulent but deliberately avoided learning the truth. *See id.* at 255-58 (evidence showed that defendant did not ask questions as to source of the funds she received). Therefore, the District Court did not err in instructing the jury on willful blindness.[2]

---

[2] At trial, Mir conceded that the evidence of willful blindness was sufficient to support the jury charge and did not interpose any objection. Therefore, Mir's challenge to the willful blindness instruction was waived and precludes

Even if the District Court had abused its discretion in instructing the jury on willful blindness, the error was harmless. Ugwu admitted that "there was evidence from which a properly charged jury might have concluded that he had actual knowledge of wrongdoing," (Ugwu's Br. 18), so any error did not prejudice him. *See Stadtmauer*, 620 F.3d at 260 n.26 (any error was harmless, as the willful blindness charge contained the correct legal standard and there was ample evidence of defendant's actual knowledge).

B.

During summation, Defendants asked the jury to draw an adverse inference against the Government for failing to call Eliasof, the "mastermind of the fraud." (Ugwu's Br. 31). In the rebuttal summation, the Government responded to the Defendants' remarks. The Government pointed out to the jury that the defense had the opportunity to call Eliasof, but chose not to. The Government then asserted, "[i]f [Eliasof] would have exonerated their clients, they could have called him, but they didn't, *because he wouldn't,* and what they're trying. . . ." (App. 902; emphasis added). At that point, defense counsel objected, asserting that the Government was "testif[ying] about what Mr. Eliasof would have said." (*Id.*) In response, the District Court stated that "I think it is fair comment for [the Government] to talk about the fact that [Defendants] could have called Mr. Eliasof, but not what Mr. Eliasof would have said, so to that extent, I sustain [the objection]" (*Id.*) The following day, Defendants requested that the Court give an additional curative instruction, reminding the jury that the comment was

---

appellate review. *See United States v. Wasserson*, 418 F.3d 225, 240 (3d Cir. 2005) (failure to object to jury instruction at trial waives any right to challenge the instruction on appeal).

improper and they were to disregard it. The District Court declined to give such a curative instruction, finding it unnecessary.

We review the refusal to give a particular jury instruction for abuse of discretion. *United States v. Jimenez*, 513 F.3d 62, 74 (3d Cir. 2008) (citing *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir. 2006)). Defendants challenge the District Court's refusal to give a curative instruction, arguing that the Government's statement inappropriately shifted the burden of proof to them.

Defendants had equal access to the witness, and they requested the jury to draw an inference adverse to the Government for its failure to call the witness. The prosecutor in such circumstances is permitted to reply to such an argument. *United States v. Sblendorio*, 830 F.2d 1382, 1392 (7th Cir. 1987). Asking or permitting the jury to draw the conclusion that, had an available but uncalled witness been called by the defense, his testimony would have been harmful, is permissible and does not shift the burden of proof to the defendants. *United States v. Caccia*, 122 F.3d 136, 140 (2d Cir. 1997); *Sblendorio*, 830 F.2d at 1394 ("The prosecutor asked for an inference, which does not alter the burden of proof.").

As for the Government's inappropriate suggestion that Eliasof would not have exonerated Defendants had he testified, the Supreme Court has instructed appellate courts to consider "the scope of objectionable comments" in the context of "the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence support the defendant's conviction." *United States v. Young*, 470 U.S. 1, 11 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a

7

reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."). Here, Defendants objected to a single comment made in the rebuttal summation, and their objection was sustained. The District Court had instructed the jury that arguments by counsel were not evidence, the Government bore the burden of proof, and Defendants were "not required to present any evidence or produce any witnesses." (App. 849). Under these circumstances, the District Court did not abuse its discretion in denying the Defendants' request for a curative instruction.

C.

In addition to the arguments presented by Ugwu, Mir independently challenges the District Court's determination that a two-point offense level enhancement for abuse of a position of trust was warranted. Mir urges that the District Court should have conducted a case-specific inquiry into his position because the special trust required to apply the enhancement is not inherent in the relationship between a mortgage broker and a lender.

Mir raises this contention for the first time on appeal. When an appellant raises an issue for the first time on appeal, this Court will review the District Court's decision for plain error. To satisfy the plain error standard, the appellant must establish that "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

To determine if the "abuse of trust" enhancement is applicable, the District Court will consider whether the defendant has abused a "position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. If the District Court finds such abuse, the sentencing guidelines "require the sentencing court to increase the offense level by two." *United States v. McMillen*, 917 F.2d 773, 775 (3d Cir. 1990).

The District Court must first determine whether a defendant occupied a position of trust. Three factors govern the District Court's determination of this threshold issue: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in the defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." *United States v. Thomas*, 315 F.3d 190, 204 (3d Cir. 2002) (citing *United States v. Iannone*, 184 F.3d 214, 223 (3d Cir. 1999)).

Mir was employed as a licensed mortgage loan officer by United Home Mortgage. In that capacity, he acted as a "middleman" between buyers and lenders in return for a commission, predominantly completing loan applications for two specific lenders. Although we have not decided in a precedential opinion whether or not mortgage brokers necessarily occupy a position of trust with respect to their client lenders, the Courts of Appeals for the Fifth and Eighth Circuits have held that mortgage brokers plainly hold positions of trust with respect to their client lenders, because those lenders depend on them to provide accurate information about prospective borrowers. *United States v. Septon*, 557 F.3d 934, 937-38 (8th Cir. 2009); *United States v. Wright*, 496 F.3d 371, 377

9

(5th Cir. 2007)). In *United States v. Fuchs*, 635 F.3d 929 (7th Cir. 2011), by way of contrast, the Seventh Circuit, while refusing "to say that a mortgage broker can *never* occupy a position of trust with respect to his lenders," *id*. at 937, found that the evidence did not establish "a special relationship of trust outside of the ordinary arms-length, commercial relationship between [the broker] and the lenders." *Id.*

In this case, the Presentence Report accurately stated that Mir repeatedly falsified information on loan applications to make it appear that borrowers qualified for financing when in fact they did not. Unlike in *Fuchs*, the evidence in this case was not limited to generalities concerning the structure of the mortgage financing industry. Instead, there was evidence that Mir, as a licensed mortgage loan officer, used phony verifications of employment, earnings and credit history to induce lenders who reposed trust in him to extend more than $2 million in credit over a period of time exceeding three years. It is evident that Mir's position made the fraud more difficult to detect, considerable authority to make the transactions was accorded Mir, and there was substantial reliance upon his integrity. Under the circumstances, the District Court did not plainly err in finding that Mir both occupied a position of trust *vis a vis* the lenders, and abused that trust to facilitate and conceal the crime.

D.

Finally, Mir contends that the District Court erred in calculating the amount of loss for sentencing and restitution purposes. Mir contends that the District Court should have accounted for the recent economic downturn and collapse of the real estate market in calculating the loss. Mir, however, waived this argument when he withdrew his

10

objection to the presentence report's loss estimate, the corresponding sixteen-level increase under U.S.S.G. § 2B1.1(b)(1)(I), and the amount of restitution to be paid. Because Mir expressly withdrew his objections to the loss calculation, he cannot now challenge the resulting sentencing enhancement or restitution order. *See United States v. Streich*, 560 F.3d 926, 929 n.1 (9th Cir. 2009) (where, as here, a defendant expressly withdraws an objection to a determination made in a presentence report, "he has done more than forfeit his objection; he has waived it completely.").

III.

For the foregoing reasons, we will affirm the District Court's judgment.